This time we'll hear United States v. Yamamillo. Thank you, your honor. Your time is appreciated. Good morning. Good morning, your honors. May it please the court, my name is Brendan White. I represent appellant Pedro Yaramillo. The issue here is quite simple, that Mr. Yaramillo's 144-month sentence, well above the 78- to 97-month guideline range, was procedurally and substantively unreasonable. There's no getting around the fact that Mr. Yaramillo committed a serious crime. He was caught. He pled guilty quickly, pursuant to a plea agreement. The plea agreement contemplated guidelines that included an accurate, as I understand the case, amount of loss of approximately $1 to $1.2 million, enhancements for sophisticated means, enhancement for number of victims, and a four-level enhancement for having been a commodities trader at the time of the offense. So that 78- to 97-month sentence was not a sweetheart deal, did not ignore any of the relevant factors in any way. He did plead guilty quickly and received credit, as he should have, for acceptance of responsibility. You have to show plain error, right? Pardon? You have to show plain error, correct? Well, your honor, I mean, he was sentenced above the guidelines. He reserved the right to the plea agreement allowed for an appeal of any sentence above 97 months. Yeah, but to prevail, if we are to agree with you, we have to agree there was plain error because the objection to what took place at the sentencing was not preserved. Well, with respect to substantive unreasonableness, of course, the argument was that the sentence should be within the guidelines. The government argued for a sentence. We hear those arguments all the time. Why is this outrageous? Why does this shock the conscience? Well, the degree to which it exceeded the guidelines is quite substantial here, nearly double the low end of the guidelines. Judge Swain, when she imposed sentencing, sort of recite all of the things that she was taking into consideration, and where did she err and what? Well, she did, but she's required to, well, in order to go substantially above the guidelines, as this court has held in Singh, the court should have a rationale that the more serious the... You've got two of the three Singh judges. Not that I had a particular . . . as is usual, my great recollection of Singh, but it seemed to me there were some things that the district court did in that that also sort of misstated or misunderstood the record. I'm certainly not claiming that to be the case here, Your Honor. No, no. Right, but I mean, it seemed to me that may well have been a factor in the court's decision in Singh. Ultimately, however, the holding did state that the greater the upward variance, the greater the reason should be, and the reasons stated by the district court judge here were completely covered in the agreement, in the guidelines, and in the submissions by the parties, and in the probation report. What rule do we pronounce so that district courts don't make this error that you claim is an error, make this same mistake? What do we say? We write an opinion saying, District Court, you got it wrong. You did this, and you shouldn't have. You're limited to doing this. What do we say to the district courts when they are imposing sentence in a case like this, which seems to me, based on what the district court recited, was pretty outrageous? There has to be some degree of similarity between the degree of upward variance and the factors that warrant that upward variance, which I do believe is the holding of Singh, ultimately. Similarly, with respect to the clearly prohibited factor of unwarranted sentencing disparities, it's obvious. The government itself was arguing that there should be a within guidelines sentence and used the case United States v. Wells, a case which involved a greater loss amount, I believe more victims, and the defendant there received a sentence approximately a hundred months lower than Mr. Yaramio received, about three times less. I don't know how much money was lost in that case or what percentage of people's net worth was taken from them, but the findings here is you had twenty-six people who . . . stripped of all their assets in a predatory way, and they ended up with nothing, and some of them had family members who were ill to support. The judge said it had a devastating impact and that basically it was a disgusting thing to do, and unusually depraved, I think is the phrase. I'm not going to argue with most of what you just said, Your Honor, which obviously does reflect the record. However, there's no doubt it will cause severe harm to the victims in this case, as I would submit is . . . You can steal more money from people with a lot of money, and it won't have as devastating an impact as if you steal less, but everything, from people who have very little. That may well be true, but frankly, my understanding of Wells is that the circumstances were quite similar there. They were talking about . . . I don't recall them, but . . . Of course. It's discussed in my brief that the victims there were often working-class people who lost substantial amounts of their life savings. And sad to say, that is often true in fraud cases, as we all know. But regardless, the guidelines here, and the tongue twister, Guideline 2B1.1B2B . . . That one. Yes. I had to write that one down. Expressly includes the degree of harm. It discusses things like whether the victims have to work more years, how this affects their life savings. These are all things that are expressly contemplated in that guideline, which added four levels to the guideline sentence, and was discussed in both the pre-sentence report, the plea agreement, and the government's letter. In fact . . . If a district court, in imposing sentence on a person who commits fraud, we're doing this hypothetically, looks at those factors that are covered in the guidelines, but then looks at the facts before her and says, but this is particularly egregious. This is . . . Those factors plus. The district court is precluded from ratcheting up the sentence? It's not precluded, clearly. Aren't we there? The court has discretion, but I believe this court, and Your Honors may well have a different idea about this than I do, but I can only go by what I read and seen, that the court must nevertheless consider the degree to which those factors truly exceed what the guidelines say, and I just don't see it here. The probation department saw those very things. It included those statements from those very same victims, strong, emotionally-wrenching statements. They were included in both the pre-sentence report and the government sentencing letter. The probation department recommended the low end of the guidelines, seventy-eight months, and the government recommended a within-guideline sentence. We got a sentence almost fifty months higher than the high end of the guidelines. You preserved a couple . . . There was no step up for vulnerable victims enhancement, was there? No, there was not, Your Honor. Thank you. If there had been, what would the guidelines range have been? I'm embarrassed to admit I don't have my guidelines manual with me. There would have been an increase. He received a sentence of approximately four levels higher than the top end of the guideline. Thank you, Your Honors. Ms. Griswold. Good morning. May it please the Court. My name is Andrea Griswold. I represent the government here on appeal, and I represented the government in the district court proceedings before Judge Swain. Judge Swain did not commit plain error or abuse her discretion when she imposed the sentence in this case. After conducting, over the course of two days, a sentencing hearing, during which she heard from twenty-six victims, and then she articulated in grave detail exactly why she imposed the sentence she did, starting first with procedural reasonableness, which is . . . Did she discuss the parsimony clause? Did she say why this was, why this great a variance was necessary and not more than was necessary? She didn't use the words the parsimony clause, but what she did do was she pointed to the particular aggravating factors, which are not accounted for in the guidelines range here, as the reason why she imposed the sentence that she did. So very particularly, she pointed to the non-financial harm to the victims in this case, the psychological and the emotional harm. That is not something that is accounted for in the guidelines. To respond to a point that Your Honor made, the enhancement for the victims here was for five or more victims who had experienced significant financial harm. At sentencing, she heard from more than twenty-six victims. But not a vulnerable victim enhancement? The guidelines in this case, the vulnerable victim enhancement, is incorporated within the change to the guidelines that accounts for victims who have experienced significant financial harm. So it was accounted for in that way, but it was only five victims you're allowed to include that enhancement. So my point is that she heard the guidelines range of seventy-eight to ninety-seven months accounted for . . . The PSR with respect to victim-related adjustment recommended none. I'm sorry, the PSR . . . The PSR in the victim-related adjustment category recommended no adjustment. Apart from the guidelines range, an additional . . . The enhancement under the guidelines that was applied for victims here was a four-point enhancement in the guidelines, which was in the plea agreement and was also reflected in the PSR. There was no additional adjustment that was either recommended in the PSR or by the parties in this case. I don't think there's an additional vulnerable victim adjustment that could have been incorporated in the guidelines that were applied at sentencing here. So what my point was, was that the factors that were not counted for in the guidelines here are the specific aggravating factors that Judge Swain pointed to in imposing the sentence here. She also pointed specifically to the depravity of the conduct when looking at the offense conduct here. And she looked at . . . And to distinguish this from the Wells case, which was also a case that I handled, in the Wells case, the defendant didn't start out to steal money from victims. As in many cases of Ponzi schemes, he started out in earnest trading and then took a wrong turn and the conduct from there was deplorable. But Judge Swain specifically noted the depravity here that the defendant set out and beginning to not conduct any trading, to just take money from these vulnerable victims. And that is not something that is accounted for in the guidelines. She also pointed to the . . . What did he target them? What did he do to get to his victims? Absolutely, Your Honor. What he did was he targeted them based on the fact that they were from Latin America. How? How did he get to them? Absolutely, Your Honor. I read that he had a YouTube performance, but isn't that something that everybody could access? Yes, Your Honor. There was a YouTube performance. He had an office maintained on Wall Street. It was often word of mouth. He would get one victim. I'll give you a great example. So Marissa Metrel, she was one of the victims who testified at the sentencing hearing. He found her at a community center that he had another individual go, and he would wait where people would come to get free meals. This is not something, that fact I just gave you, that's in the record. But what is in the record is that he targeted Peruvians and other individuals from Central America, that he said to them, I know how to trade, and I've been able to make money for individuals, and I'm going to help you. You're Peruvian. I'm Peruvian. That is something that is in the record here. There are, for example, the victim Carrasco in Appendix 106. He gained my trust. I believed he was Peruvian who wanted to help other Peruvians, and I believed him. And I think that in fashioning the sentence. How did he have contact with these people in order to have that conversation, which is referenced here? Absolutely, Your Honor. He does have to have contact. But he knew people. He was part of a masonry guild, and this is also something that's reflected in the statements that were made by the victims. And he would recruit people who were other masons. So some of the victims in this case were actually construction workers, manual laborers from Peru and from other Latin American countries who had earned their money in that regard. And so he had one victim who was a member of the masonry guild, who then through that he would gain access to other victims. So I think the record based on the statements made by the victims demonstrates the type of reach and access that he was able to get into this vulnerable immigrant community based on saying, I'm also Peruvian and I'm going to help you. So she made a very clear record over the course of these two days explaining why she was focusing on these aggravating factors, many of which were not accounted for in the guidelines, in imposing her sentence. And we don't think that that could possibly be plain error. Turning to substantive reasonableness, and I want to respond particularly to the point about the size of the variance having to be accounted for, not just the fact of a variance. The cases are clear, and I want to get specifically to the Singh case, that so long as the aggravating factors that are pointed to can carry the weight of the variance, then it's not for the appellate court or the government to think about what weight they would give to those factors. It's to consider can those factors she pointed to carry the increased weight. In the Singh case, Judge Forrest committed procedural error in that she found that the defendant had two prior convictions for illegal reentry prior to the one that brought him before her. And then in stating that a sentence three times the guidelines was appropriate, she specifically pointed to the concern about recidivism, that he was going to come right back. So the factor that she pointed to to aggravate and enhance the sentence could not carry the weight of that increase because it was not, in fact, correct. Here, the factors that Judge Swain pointed to on the record, the vulnerable nature of the victims that was not accounted for in the guidelines, the depravity of the conduct here, and the other factors that I've already gone through can bear the weight of the increased factor as Judge Swain set forth. One other point that I would like to make is that the government's sentencing recommendation in our memo was put in prior to the hearing that occurred over two days where the nature of the impact to the victims as well as the defendant's lack of remorse had not yet been laid bare before the court. And the impact, I think, that Judge Swain had in her decision in fashioning the appropriate sentence and in figuring out what weight to give the impact to the victims and the defendant's lack of remorse, that had not come fully to bear at the time that that recommendation was made, nor is it the same to say that the sentence that the government might suggest is the same as whether or not Judge Swain abused her significant discretion in figuring out where within the range of reasonable sentences the defendant should be sentenced. And if the court doesn't have any further questions since I'm over time... You've still got a minute. Oh, excuse me. Don't let that stop you. Actually, you've got two minutes. I am curious about one thing, which really goes to the point that you just made. I mean, the government's . . . Sorry, U.S. Attorney's offices still have victim witness coordinators, do they not? They do. And that information hadn't been gleaned? The information about the impact on a number of these folks which came to light in the hearing had not been made available to that coordinator? No, Your Honor. I don't want to leave that impression at all. I mean, this was a case about the victims. The government had met with many of the victims. They had put in letters. I think if you compare in the PSR references, I think less than a dozen letters. What I'm saying is it's a matter of degree. More victims came. They told more specific stories, more specific anecdotes about how they had been ensnared and the impact. People lost marriages. They lost homes that it had on them. And what I'm saying is at the sentencing hearing, the true impact of that went beyond what the government was aware of when they made their sentencing recommendation, and that was the point I was trying to make. Thank you. Thank you, Your Honor. Just with respect to that last point, there's a fairly thin line between what was discussed in pretty good detail in both the pre-sentence report and in the government sentencing letter and what was heard at sentencing itself. Of course, the judge had the opportunity to see and hear these people, and I'm not suggesting that that can't be a factor. Obviously, it can. I suggest to Your Honors that it was too much of a factor here, that the judge was swayed to an overwhelming degree by those statements, to an unreasonable degree, and that motivated the sentence. In terms of lack of remorse, I mean, frankly, I just don't believe that's fair. The defendant stated repeatedly his remorse. He didn't try to minimize his conduct, blame anybody else for it. We've seen cases, I mean, it's rare, thankfully, where a judge will reprimand a defendant on the spot. I see you smirking here. You're laughing. There was nothing like that here. The judge said you sat here stone-faced. Attorneys routinely advise their clients don't react. This is a serious proceeding. He didn't react. He sat there with a serious expression on his face. I don't think that can carry the weight of, in the face of his repeated statements that I am sorry for what I did. By the way, this is a man in his late 40s who had no criminal history. He obviously committed a wrong and is paying for it. He was ready to pay for it. But I don't think it's reasonable to conclude just by his facial expression that he was not remorseful here. Just one last thing, if I may, Your Honors. Defense counsel did a reasonable job here up until sentencing. At the point where the judge said, I am seriously considering going above the guidelines on this sentence, do you want to add anything as a result of that? Enormous red flag at that point. The government took full advantage of the opportunity. At that point, counsel basically abdicated and said, no, we're just going to rely on what we've said already. There are many things he could have said differently, explained to the judge why a within guidelines sentence that everybody had stipulated to and had been recommended was the appropriate one. You're asking us to make an ineffective assistance determination. I know this court's position on that argument being raised here, but it does color the ultimate sentence here. Things could have been different here. By the way, counsel, the very same counsel, didn't even bother to file a notice of appeal in this case. The defendant had to file one pro se and a new counsel had to be assigned. It appears at that point he had basically just moved on. I believe that the court can and should take that in consideration when weighing the ultimate sentence that was received here. Thank you, Your Honors. Both? We'll reserve decision.